FILED
2011 Jul-29  PM 04:57
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MELINDA BOYD, on behalf of herself and other similarly situated** | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action Number: |
| | ) | **2:10-cv-02420-AKK** |
| v. | ) ) | |
| **TTI FLOORCARE NORTH AMERICA,** *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## <u>MEMORANDUM OPINION</u>

Pending before this court are two separate cases, civil actions 2:10-cv-02420-AKK ("<u>Boyd</u>") and 2:10-cv-02421-AKK ("<u>Green</u>"), that involve identical questions of law and fact, and in which the defendants have moved to dismiss. Docs. 12 and 13 in <u>Boyd</u>; docs. 11 and 12 in <u>Green</u>.  The defendants in <u>Boyd</u> are TTI Floorcare North America ("TTI") and Wal-Mart Stores, Inc.'s ("Wal-Mart"), and the defendants in <u>Green</u> are Bissell Homecare, Inc. ("Bissell") and Wal-Mart. Though the parties in the two cases differ, they share respective counsel, and the motions and briefing in these two cases mirror one another precisely.  Because the pending motions present similar questions, the court has exercised its discretion

under Fed. R. Civ. P. 42(a) to issue this Memorandum Opinion in both actions.  At

their core, these cases involve the contentions by Plaintiffs Mandi Green

("Green") and Melinda Boyd ("Boyd") that Defendants have breached an express

warranty and violated federal racketeering laws because the name of the vacuums

they sold to Plaintiffs contain the word "steam" but do not, in fact, use steam in

the cleaning process.  For the reasons stated more fully below, the court **GRANTS**

Defendants' respective motions to dismiss.

## I.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a

short and plain statement of the claim showing that the pleader is entitled to

relief."  "[T]he pleading standard Rule 8 announces does not require 'detailed

factual allegations,' but it demands more than an unadorned, the-defendant-

unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, ---U.S.---, 129 S. Ct. 1937,

1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Mere

"labels and conclusions" or "a formulaic recitation of the elements of a cause of

action" are insufficient.  *Iqbal*, 129 S. Ct. at 1949 (citations and internal quotation

marks omitted).  "Nor does a complaint suffice if it tenders 'naked assertion[s]'

devoid of 'further factual enhancement.'"  *Id*. at 1949 (citing *Twombly*, 550 U.S. at

557).

Federal Rule of Civil Procedure 12(b)(6) permits dismissal when a complaint fails to state a claim upon which relief can be granted.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1949 (citations and internal quotation marks omitted).  A complaint states a facially plausible claim for relief "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted).  The complaint must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").  Ultimately, this inquiry is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950.

On a motion to dismiss under Rule 12(b)(6), the court accepts all of a plaintiff's factual allegations as true. *See, e.g.*, *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000).  However, legal conclusions unsupported by factual allegations are not entitled to that assumption of truth. *Iqbal*, 129 S. Ct. at 1950.

## II.  FACTUAL BACKGROUND

TTI designs, markets, and manufactures a variety of vacuums and carpet cleaners including the Hoover SteamVac SpinScrub®.  Doc. 1 at ¶10 in <u>Boyd</u>.  TTI and Wal-Mart allegedly market the Hoover carpet cleaners as "Steam Vacs and Steam Cleaners."  *Id.* at ¶11.  Both TTI and Wal-Mart allegedly know the SteamVac® does not produce steam – it uses hot tap water without heating the water itself – in its cleaning process.  *Id.* at ¶¶9, 11-12.  Boyd purchased the SteamVac® at a Wal-Mart in Gardendale, Alabama.  *Id.* at ¶14.  Boyd allegedly "suffered damages in the form of being delivered a product worth substantially less than the product . . . would have been worth" if it used steam to clean.  *Id.* at ¶¶16, 21.  Boyd has notified both TTI and Wal-Mart of the alleged breach of warranty.  *Id.* at ¶15.  Nonetheless, Wal-Mart still markets, advertises and sells TTI's Hoover SteamVac® and profits from those sales.  *Id.* at  ¶¶ 12-13.

Similarly, Bissell designs, markets, and manufactures a variety of vacuums and carpet cleaners including the Bissell PowerSteamer®.  Doc. 1 at ¶10 in <u>Green</u>.  Bissell and Wal-Mart allegedly market the Bissell carpet cleaners as "Power Steamers, Steam Vacs and Steam Cleaners."  *Id.* at ¶11.  Both Bissell and Wal-Mart allegedly know that the PowerSteamer® does not produce steam – it also uses hot tap water without heating that water itself – in its cleaning process.  *Id.* at

¶¶9, 11-12.  Green purchased the PowerSteamer® at a Wal-Mart in Eastwood, Jefferson County, Alabama.  *Id.* at ¶14.  Green allegedly "suffered damages in the form of being delivered a product worth substantially less than the product . . . would have been worth" if it used steam to clean.  *Id.* at ¶¶16, 21.  Green has notified both Bissell and Wal-Mart of the alleged breach of warranty.  *Id.* at ¶15.  Nonetheless, Wal-Mart still markets, advertises and sells Bissell's PowerSteamer® and profits from those sales.  *Id.* at  ¶¶ 12-13.

### III. PROCEDURAL HISTORY

This is the third action Green and Boyd have filed based upon the same facts.  On April 20, 2010, Boyd filed a class action complaint for breach of express warranty based upon the Hoover SteamVac product.  *See* No. 2:10-cv-01022-AKK.  Two days later, Boyd filed her notice of voluntary dismissal pursuant to Rule 41, and the court dismissed the case accordingly.  *Id.* at docs. 4, 6.  Likewise, on April 20, 2010, Green filed a class action complaint for breach of express warranty based upon the Bissell PowerSteamer product.  *See* No. 2:10-cv-01023-AKK.  Two days later, Green also filed a notice of voluntary dismissal, and the case was, likewise, dismissed.  *Id.* at docs.  2, 4.

On April 28, 2010, Green filed a new class action for breach of express warranty.  *See*  2:10-cv-01040-AKK.  Defendants Bissell and Wal-Mart filed

motions to dismiss on the grounds that the PowerSteamer name did not create an express warranty. *Id.* at docs. 13, 14. Before the court ruled on those motions, an intervening Eleventh Circuit case[1] made apparent the lack of subject matter jurisdiction. On September 8, 2010, the court dismissed Green's case without prejudice for lack of federal subject matter jurisdiction. *Id.* at doc. 28.

Mirroring Green, on April 28, 2010, Boyd also filed a new class action for breach of express warranty. *See* 2:10-cv-01065-AKK. Defendants TTI and Wal-Mart filed motions to dismiss on the grounds that the SteamVac name did not create an express warranty. *Id.* at docs. 10, 12. On September 8, 2010, the court dismissed Boyd's case without prejudice also for lack of federal subject matter jurisdiction.[2] *Id.* at doc. 28.

*That same day*, Boyd and Green filed the instant actions. *See* doc. 1 in Boyd; doc. 1 in Green. They added no new factual allegations, but asserted RICO claims, *see id.*, ensuring federal subject matter jurisdiction over their cases once again.

Here, Boyd claims that by selling a product called SteamVac® that does not

---

[1]That case, *Cappuccitti v. DirecTV, Inc.*, 611 F.3d 1252 (11th Cir. 2010), was eventually vacated by the same Eleventh Circuit panel who granted a rehearing and reversed its course. *Cappuccitti v. DirecTV, Inc.*, 623 F.3d 1118 (11th Cir. 2010). Neither *Cappuccitti* decision has any bearing on this case because Plaintiffs alleged a RICO violation, creating federal jurisdiction.

[2]*See supra* n.1.

produce steam in its cleaning process, TTI and Wal-Mart breached an express warranty.  Doc. 1 in <u>Boyd</u>.  In addition, she asserts that TTI and Wal-Mart's advertisement and sale of the SteamVac® product violates the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, because Defendants know it cannot produce steam.  *Id.*  Likewise, Green claims that by selling a product called PowerSteamer® that does not produce steam in its cleaning process, Bissell and Wal-Mart breached an express warranty and violated RICO through the advertisement and sale of a product they knew could not produce steam.  Doc. 1 in <u>Green</u>.  The court addresses the breach of warranty claims first, then moves to Plaintiffs' RICO allegations.

## IV.  ANALYSIS

### A.  Breach of Express Warranty

At the heart of their respective cases, Plaintiffs assert that the PowerSteamer® and SteamVac® trade names **<u>alone</u>**[3] create express warranties as to the process the products use.  The gravamen of their complaints is that these

---

[3] Notably, Plaintiffs do not allege that any additional advertising, labeling, statements or representations by Defendants support the creation of an express warranty.  Likewise, Plaintiffs do not assert that the products in question failed to clean as effectively as they desired.  Nor, even, do Plaintiffs assert that they purchased the products because they believed the vacuums used steam.  Thus, Plaintiffs base their express warranty claims solely on the argument that the names alone created a core promise to each consumer that the products would clean *by producing steam*, regardless of the product's effectiveness.

names expressly warrant that the products use or produce steam and create core

descriptions that support the existence of an express warranty.

(i) <u>Express Warranty Under Alabama Law</u>

Under Alabama law:

(1) Express warranties by the seller are created as follows:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

. . .

> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

ALA. CODE, 1975, §7-2-313.  The crux of an express warranty claim is that "the

goods did not conform to the warranty." *Ex parte Miller*, 693 So. 2d 1372, 1377

(Ala. 1997).  "Absent clear and affirmative proof to the contrary, any descriptions

presented as affirmations of fact are presumptively a basis of the bargain." *Shutter*

*Shop, Inc. v. Aversham Corp.*, 114 F. Supp. 2d 1218, 1230 (M.D. Ala. 2000); ALA.

CODE § 7-2-313 (1975), cmt. 3, 8.

(ii) <u>Case Law Relied Upon by the Parties</u>

The question before the court is whether the SteamVac® or PowerSteamer®

names create an affirmation of fact that the products will use steam in the cleaning

process.  To help the court resolve that question, the parties cited numerous cases

each claimed as analogous to its respective position.  Because examination of

those cases is helpful in illustrating the contours of the law surrounding express

warranty claims,[4] the court reviews in detail the primary cases the parties cite.

(a) *Plaintiffs' Supporting Case Law*

Plaintiffs contend that myriad cases have held that a seller may create an

express warranty based on the name it gives a product if that name contains a

factual description of the goods sold.  *See* doc. 16 at 7 in <u>Green</u>; doc. 19 at 7 in

<u>Boyd</u>.  As one of the few Alabama cases even remotely related to the instant

action, Plaintiffs cite to *La Trace v. Webster*, 17 So. 3d 1210 (Ala. Civ. App.

2008), to show Alabama law supports an express warranty based on a product's

description within a trade name.  *See* doc. 16 at 8-10 in <u>Green</u>; doc. 19 at 8-10 in

<u>Boyd</u>.  In *La Trace*, the Alabama Court of Civil Appeals considered whether a

---

[4] The court notes that the parties cite numerous authorities from outside of Alabama.  In light of the uniformity with which the UCC is adopted from state to state, non-Alabama cases are helpful in identifying interpretations under virtually the same code.

seller's description of his product as "Tiffany" lamps constituted an express

warranty.  17 So. 3d at 1218-19.  The court found that "the lamps in this case were

sold with the core description of Tiffany products," that the seller's oral

description and repeated affirmations of the lamps' authenticity created an express

warranty that the lamps were real Tiffany lamps, and because the seller's

affirmations about authenticity were part of the core description, the seller could

not disclaim it thereafter.  *Id.* at 1219.  Therefore, since the defendant conceded at

trial that the lamps were not, in fact, authentic Tiffany-brand lamps, the court

found that the plaintiffs were entitled to judgment as a matter of law.  *Id.*  Notably,

the court relied upon multiple oral statements by the seller that the products were

Tiffany lamps to constitute the affirmations of fact and descriptions to create an

express warranty that, in fact, the products were *authentic* Tiffany lamps.  *See id.*

Likewise, Plaintiffs rely on *Neff v. Kehoe*, 708 F.2d 639 (11th Cir. 1983), in

which the Eleventh Circuit held that the seller's oral description of a counterfeit

gold coin as a 1907 gold coin and affirmation that the coin was genuine and "just

like" one reportedly sold for $200,000 were sufficient for a jury to find that the

seller breached an express warranty of authenticity.  *Id.* at 644.  Importantly, the

jury relied on the seller's specific promises that the coin was genuine to show the

existence of an express warranty that the coin was, indeed, authentic.  *Id.*

Plaintiffs also cite to *Fleck v. Jacques Seed Co.*, 445 N.W. 2d 649 (N.D. 1989), for the premise that providing round seed, instead of the contracted flat seed, supports an express warranty based on the product's name.  *See* doc. 16 at 8 in Green; doc. 19 at 8 in Boyd.  The question in *Fleck* was whether the failure of the seller's agent  to inform the buyer that it had substituted round seed for the flat seed the buyer requested was a breach of warranty.  445 N.W. 2d at 652.  The buyer had previously informed the seller's agent that he required flat seed because his planter did not process round seed.  *Id.*  Ultimately, the Supreme Court of North Dakota remanded the case for new trial – the trial court had improperly converted the plaintiff's breach of warranty claim into a fraud claim – without deciding whether an express warranty existed.  *See id.* at 653-54.

Plaintiffs rely perhaps primarily on *Williams v. Gerber Products Co.*, 552 F.3d 934 (9th Cir. 2008), in which the Ninth Circuit reversed the trial court's dismissal of claims involving a product named "Fruit Juice Snacks" that did not contain juices from the fruits that appeared on the product's label.  Doc. 16 at 11-12 in Green; doc. 19 at 11-12 in Boyd.  Plaintffs contend that "[t]he name of the product, together with the depiction of various fruits on the package label, was sufficient . . . to constitute a misleading affirmation of fact that the product contained" juice from the fruits on the product label.  *Id.*  However, the Ninth

Circuit *never* addressed the merits of plaintiffs' breach of warranty or misrepresentation claims.[5]  *Gerber Products*, 552 F.3d at 940 n.5.  Instead, the court focused its entire analysis on whether the plaintiffs presented any facts that would support the conclusion that a reasonable consumer might have been deceived.  *Id.* at 938-39.  The court concluded a reasonable consumer could be deceived by "misleading representations on the front of the box" that included claims touting the product's nutritious nature and stating it was made with fruit juice and natural ingredients, photos depicting fruits not contained in the products, as well as the name "fruit juice snacks" – all of which the court found relevant for its analysis under California's consumer protection and deceptive/unfair trade practice statutes.  *Id.* at 939.

   *(b) Defendant's Supporting Case Law*

   Defendants acknowledge that Plaintiffs' breach of warranty claim is, apparently, novel in Alabama and in this Circuit.  Nonetheless, Defendants assert that other jurisdictions have considered whether trade names alone can create an express warranty to a product's quality, functioning, or contents.  For example, in *Szajna v. General Motors Corp.*, 503 N.E. 2d 760 (Ill. 1987), the plaintiff

---

[5]In a footnote, the court did note that the plaintiffs had not waived their tort claims, including breach of express warranty, and could reargue them on remand even though they failed to brief those issues on appeal.  *Gerber Products*, 552 F.3d at 940 n.5.

contended that by naming the car a "1976 Pontiac Ventura," the defendant expressly warranted to the kind and quality of the car and its components, specifically the type of transmission. *Id.* at 770-71. The court noted that the plaintiff did not allege any breach of the defendant's limited written warranty or that he saw or relied upon any express representation as to the transmissions used in the 1976 Pontiac Venturas. *Id.* at 770. Instead, the plaintiff alleged that the defendant breached the warranty simply by naming the car "1976 Pontiac Ventura" even though it used "Chevette transmissions," which were allegedly manufactured for lighter weight cars and, therefore, necessitated higher amounts of repairs and greater costs when used in the heavier Pontiac Ventura. *Id.* at 761. In other words, the plaintiff alleged that the name alone expressly warranted the transmission and components the car would use. *See id.* The Supreme Court of Illinois disagreed and concluded that "1976 Pontiac Ventura" had characteristics of a trademark and trade name and "d[id] not, alone, describe the transmission used in the car or its quality." *Id.* at 771. Thus, the court concluded "that the name '1976 Pontiac Ventura' alone does not create an express warranty of the kind or nature of the car's components." *Id.*

Defendants also cite two district court cases in California that reject an express warranty based, in part, on a product's name. In *McKinniss v. Kellogg*

*USA*, No. CV-07-2611, 2007 U.S. Dist. LEXIS 96106 (C.D. Cal. Sept. 19, 2007), the court held that the trademarked name "FrootLoops®" could not create an express warranty that the cereal contained real fruit. *Id.* at * 11. The court noted that the word "'Froot' . . . appears in the trademarked name of the cereal, not on its own or as a description of the actual ingredients of the cereal itself." *Id.* The court held that the name of the product, in conjunction with the depiction of actual fruit on the box of the product, did not create an affirmation of fact that became the basis of a bargain and, therefore, did not create an express warranty. *Id.* at *15-16. The court also noted that the actual description of the product, including its list of ingredients, did not include any claim that the product contained actual fruit. *Id.* at * 16. Thus, the court granted the defendant's motion to dismiss. *Id.*

    Likewise, in *Sugawara v. PepsiCo, Inc.*, No. 2:08-cv-01335-MCE-JFM, 2009 U.S. Dist. LEXIS 43127 (E.D. Cal. May 21, 2009), the court rejected a similar claim[6] based on the  word "berries" in the name of a cereal, "Cap'n Crunch with Crunchberries," that did not, in fact, contain any berries. *See id. at *2-3.* As in *McKinniss*, the plaintiff in *Sugawara* based her claim on the name of the product, various advertisements, and allegedly misleading and deceptive

_____

[6]The court also rejected the plaintiff's claims for intentional misrepresentation, breach of implied warranty, and violations of various provisions of the California code.

depictions on the cover of the box. *Id.* at *2-3.  The court rejected the plaintiff's

claim, noting that the defendant used "berry" in conjunction with "crunch" and

that a "crunchberry" was not an actual fruit. *Id.* at *12.  Moreover, considering the

name along with the product's labeling and advertising, the court concluded the

combination would not lead a reasonable consumer to believe the product would

contain berries and that the name did not promise anything as to the cereal's

contents. *Id.*  Quoting California's version of the UCC, the court stated

"Plaintiff's Breach of Express Warranty claim fails as a matter of law." *Id.*  Thus,

the court held that the mere presence of the word "berries" in a part of a product's

name does not create an express warranty that the product contains berries. *See

id.*; *see also Hertzog v. WebTV Networks, Inc.*, No. 48552-1-I, 2002 Wash. App.

LEXIS 1724, at *16 (Wash. App. 2002) (denying the plaintiff's contention that

naming a product a "universal remote" created an express warranty that the

product is compatible with all types of equipment – i.e. universally).

Additionally, Defendant Wal-Mart asserts that even if products' names

somehow constituted express warranties, as merely the seller, it is not liable for a

manufacturer's warranty. *See Gordon v. Pfizer*, No. CV-06-RRA-703-E, 2006

WL 2337002, at *8 n.2 (N.D. Ala. May 22, 2006) ("[M]ere delivery by a seller to a

buyer of the manufacturer's express warranty is not sufficient to make the

manufacturer's express warranty become an express warranty by the seller.");

*Dairyland Ins. Co. v. Gen. Motors Corp.*, 549 So. 2d 44, 47 (Ala. 1989) (affirming

summary judgment for a seller where the seller "was not a party to the warranty in

this case and could not be found to have specifically adopted it").  Wal-Mart notes

that other jurisdictions concur:

> An agent, dealer, or distributor cannot be held liable on a manufacturer's
> express warranty unless he has adopted it.  The mere sale of goods
> together with the transmission of the manufacturer's warranty does not
> bind an agent; and delivering, presenting, or explaining the
> manufacturer's warranty, without more, does not render a dealer a co-
> warrantor by adoption.

*Thorpe v. Hammons Sheet Metal Co.*, 991 S.W. 2d 157, 159 (Mo. App. E.D. 1999)

(quoting 77A C.J.S. Sales sec. 140 (1994)); *see also Kure v. Chevrolet Motor Div.*,

581 P.2d 603, 609 (Wyo. 1978) (holding that dealers have no liability to a

consumer for a manufacturer's warranty where they act only as a representative of

the manufacturer and did not adopt it as their own).

(iii) <u>Defendants Did Not Expressly Warrant the Use or Production of Steam</u>

The question before the court is whether a product's name alone can create

an express warranty under Alabama law.  To complicate matters further, the

Alabama Supreme Court has not directly opined on the subject.  However, based

on this court's review of Alabama cases involving express warranties and the

precedent cited by the parties here, the court concludes that the name of the products, either SteamVac® or PowerSteamer®, do not create an express warranty to the process that product would use.

Typically, an express warranty arises from specific language promising the buyer a specific service or specifically describing the bargained for item.  *See, e.g.*, *Terrell v. R&A Mfg. Partners, Ltd.*, 835 So. 2d 216, 222 (Ala. Civ. App. 2002) (express warranty describing the period for repairs and the carrying capacity); *Ricwill, Inc. v. S.L. Pappas & Co., Inc.*, 599 So. 2d 1126, 1131 (Ala. 1992) (express warranty consisting of the water temperature the product assured the purchaser it could withstand).  However, the seller need not intend to create an express warranty. ALA. CODE § 7-2-313.  Any affirmation of fact relied upon by the buyer may be considered an express warranty. *Shutter Shop*, 114 F. Supp. 2d at 1230.  Nonetheless, an express warranty must affirm a fact, promise something to a buyer, or describe the goods being sold.  *See* ALA. CODE § 7-2-313.  Mere puffery or the seller's opinion are not enough.  *Id.*

The crux of Plaintiffs' argument is that TTI and Bissell each  "expressly warranted that it was selling a 'steam' cleaner by naming its product ['SteamVac' or 'PowerSteamer'] – a statement to buyers that the carpet cleaner uses steam in the cleaning process."   Doc. 19 at 12 in <u>Boyd</u>; 16 at 12 in <u>Green</u>.  Plaintiffs point

to several cases that they claim demonstrate that a breach of warranty claim can be
created solely based on the products trade name.  A close examination of those
cases, however, illustrates just the opposite.  The vast majority stand, instead, for
the premise that a seller may create an express warranty of a good's authenticity
by referencing its manufacturer, creator, or brand name.  *See, e.g.*, *La Trace*, 17
So. 3d at 1219 (finding an express warranty of authenticity where the seller told
the buyer the products were genuine Tiffany lamps when they were, in fact,
counterfeit); *Neff*, 708 F.2d at 644 (finding an express warranty of authenticity
where the defendant told the plaintiff the coin in question was authentic when, in
fact, it was a counterfeit); *Balong v. Center Art Gallery-Hawaii, Inc.*, 745 F. Supp.
1556, 1558-59, 1564 (D. Haw. 1990) (finding an express warranty that the pieces
of art were originals where the "counterfeit artwork . . .  was sold based on the
defendants' representations that it was genuine" because the defendants
specifically told the plaintiffs that the pieces were Salvidor Dali originals and sent
them multiple, falsified certificates of authenticity); *Bill Spreen Toyota, Inc. v.
Jenquin*, 294 S.E. 2d 533, 536 (Ga. App. 1982) (upholding a jury award for fraud
and denying the disclaimer of any warranties where the defendant sold the plaintiff
a car it claimed was a "used 1974 Celica Toyota coupe" that, in actuality, was a
half of a previously totaled Celica Toyota coupe welded to an unidentified

vehicle); *see also Harris Moran Seed Co., Inc. v. Phillips*, 949 So. 2d 916, 921

(Ala. Civ. App. 2006) (noting that the affirmation of seller that the lot of seeds

contained "Mountain Fresh" tomato seeds constituted an express warranty that the

seller breached when the lot contained hybrid seeds that were not "true to [the

Mountain Fresh] type" as the seller had promised).

The other cases Plaintiffs rely upon simply indicate that a product's name *is*

a relevant consideration in whether that product violated consumer protection or

unfair trade practice claims, neither of which is present here.[7]  *See, e.g.*, *Warner-*

*Lambert Co. v. BreathAsure, Inc.*, 204 F.3d 87, 96 (3d Cir. 2000) (affirming the

district court's finding of deceptive advertising under the Lanham Act, and

concluding that, when considered in conjunction with over 6 years of misleading

claims in advertisements, the use of the name "BreathAsure" could mislead

consumers as to the product's qualities); *Gerber Products*, 552 F.3d at 939

(holding that a product's name could be misleading and deceptive under

---

[7] The distinction between Plaintiffs' claims for breach of warranty and more general claims for fraud or claims pursuant to consumer protection law or deceptive trade laws in Alabama is important.  The Alabama Deceptive Trade Practices Act ("ADTPA") bars class claims unless brought by the attorney general. ALA. CODE § 8-19-10(f).  Because of the restrictions on deceptive trade practice class claims, the court must be careful not to confuse Plaintiffs' breach of warranty claim with a more general claim that the choice of name is deceptive or otherwise violates the ADTPA.  That Plaintiffs chose to assert one but not the other prevents them from relying upon cases that cited deceptive trade practice statutes to support a claim on a motion to dismiss.

California's consumer protection and deceptive trade laws).

Notably, Plaintiffs do not allege that the respective products fail to clean effectively or do not clean as well as they would if they produced steam. Instead, Plaintiffs vaguely allege an injury because the products purchased would be worth more if they produced steam. Doc. 1 at ¶21 in <u>Green</u>; doc. 1 at ¶21 in <u>Boyd</u>. Likewise, no where in their complaints do Plaintiffs assert that they purchased the products because they believed they produced steam. Nonetheless, as a matter of contract law, Plaintiffs assert that Bissell and TTI expressly warranted that the SteamVac® and PowerSteamer® produced steam – as opposed to merely using hot water – at some point in the cleaning process. Likewise, Plaintiffs assert that because Wal-Mart sold the products, it apparently ratified the express warranty that they used steam.

Unfortunately for Plaintiffs, the absence of caselaw supporting their claim undermines their contentions. Indeed, other courts considering similar questions have noted that absence as well when rejecting such claims. *See, e.g.*, *Szajna*, 503 N.E. 2d at 771 ("[N]one of those cases stand for the proposition that a trade name is a description creating an express warranty that the product is of a particular quality or that its component parts are of a particular quality."); *Hertzog*, 2002 Wash. App. LEXIS 1724, at *16 ("[Plaintiff] offers no authority for his contention

that this name constitutes an express warranty . . . ."); *Miller v. Showcase Homes, Inc.*, No. 98-C-2009, 1999 WL 199605, at *4 (N.D. Ill. Mar. 31, 1999) ("Finally, there is no support for plaintiffs' contention that the use of a trademark or trade name gives rise to an assurance of quality" or that the "use of the Showcase trade name is *itself* an express warranty of quality.") (emphasis in original).

Conversely, the cases cited by Defendants more clearly address the relationship of a product's name to an available breach of warranty claim.  Indeed, courts reject reliance upon a tradename to show the existence of an express warranty or deception as to a product's functionality, quality, duration, or effectiveness based solely on the product's name.  *See, e.g.*, *Szajna*, 503 N.E. 2d at 771 (rejecting the name of the car as an express warranty as to the components the car would use); *McKinniss*, 2007 LEXIS 96106, at *15-16 (rejecting contentions that the name "FrootLoops" is an express warranty that the cereal contained fruit); *Sugawara*, 2009 LEXIS 43127 at *12 (rejecting that the product's tradename, "Cap'n Cruch with Crunchberries" creates an express warranty that it contains berries); *see also Schreib v. Walt Disney Co.*, No. 1-05-0094, 2006 WL 573008, at *2 (Ill. App. 1 Dist. Feb. 1, 2006) ("In this case, defendant, by naming the products 'Gold Collection' or 'Masterpiece Collection' did not make an affirmation of fact or a promise that the videotapes would last for generations or

that they would have an extraordinary life span."); *Showcase Homes*, 1999 WL 199605, at *4 ("Finally, there is no support for plaintiffs' contention that the use of a trademark or trade name gives rise to an assurance of quality" or that the "use of the Showcase trade name is *itself* an express warranty of quality.") (emphasis in original).

Here, the products in question include the word "steam" in their names, which Plaintiffs assert expressly warrants that the vacuums will use steam or produce steam when cleaning. Importantly, Plaintiffs do not allege and apparently concede that the advertising and packaging associated with Defendants' products make no mention of steam nor any claims to use or produce steam. *See* doc. 11 in Green at 4-5; doc. 12 in Boyd at 4-5 (Defendants' briefs note the absence in the respective complaints of allegations that the word "steam" appears on the products' packaging or in advertisements, which Plaintiffs do not rebut). The court is persuaded, then, that the trademarked name alone, as in *Szajna* or *Sugawara*, makes no warranty as to what a product does or contains. Plaintiffs contend, however, that unlike those cases, here, a steam cleaning vacuum is a specific thing and the name of the products misleads consumers into believing the SteamVac® and PowerSteamer® are, in fact, steam cleaning vacuums. However logical Plaintiffs' contention, a product's trademarked name is more akin to sales

talk and puffery, which are not actionable bases for an express warranty claim, than to a description of a product, a promise, or an affirmation of fact.  *See* ALA. CODE §7-2-313.  Again, the court notes that Plaintiffs allege only a breach of warranty claim, not a claim for fraud or a claim under Alabama's deceptive trade statute.

Ultimately, the court is persuaded that the trade names SteamVac® and PowerSteamer® do not expressly warrant what those products will or can do. Indeed, this is the crucial point.  Plaintiffs' citations to case law reiterate the limit of what a product's trademarked name can expressly warrant – authenticity.  The names in question here do not provide an affirmation of fact as to what the product does.  They provide, instead, an affirmation of what the product *is* - in other words, they provide a promise that the product sold is an authentic SteamVac® or PowerSteamer®.  They do not create an affirmation of fact nor do they describe the cleaning process the product uses.

At best, Plaintiffs cite to cases that illustrate a product's name, when considered in conjunction with a history of advertisements or statements about the product's contents, can mislead a consumer in violation of consumer protection and deceptive trade laws, *see Breath Assure*, 204 F.3d at 96; *Gerber Products*, 552 F.3d at 939, or that a seller's promise to deliver a product by name expressly

warrants that the seller will deliver an authentic version of the product he named, *see La Trace*; 17 So. 3d at 1219; *Neff*, 708 F.2d at 644.  Importantly, in many of the cases Plaintiffs cite, courts considered the product's name in the context of a deceptive trade practice or unfair competition claim.  While the court stops short of holding that the names SteamVac® or PowerSteamer®, alone, are not misleading, it notes that Plaintiffs alleged only breach of express warranty.  The court cannot fashion a remedy for a claim Plaintiffs do not allege.[8]

In sum, while Plaintiffs' breach of warranty claims have a logical appeal, the court cannot find any law supporting their contention that a registered trade name, without more, creates an express warranty as to what that product will *do*.  Though Plaintiffs conflate the two concepts, the court views an express warranty as to what a product *does* as distinct from an express warranty as to a product's *authenticity*.  Whatever Plaintiffs' complaints with respect to the PowerSteamer®

---

[8]The court notes, also, that Plaintiffs failed to demonstrate how Wal-Mart would be liable for the express warranty resulting from the name of the products. Alabama courts hold that a seller neither adopts the express warranty nor issues its own express warranty simply by selling a product that the manufacturer has expressly warranted. *See Gilliam v. Indiana Nat. Bank*, 337 So. 2d 352, 354 (Ala. Civ. App. 1976) (rejecting the notion that simply by including a manufacturer's express warranty the seller thereby warranted the product as well).  *Cf. Liberty Truck Sales, Inc., v. Kimbrel*, 548 So. 2d 1379, 1382-83 (Ala. 1989) (holding that where a seller referenced the manufacturer's warranty several times, specifically incorporated it, and repaired the plaintiff's car pursuant to the warranty previously, the seller had adopted the express warranty itself). Here, Wal-Mart has not ratified any express warranty simply by selling a product Defendants Bisell and TTI named, even assuming Wal-Mart knew the products did not produce steam.  To subject Wal-Mart to liability would require all retailers to police descriptions made by manufacturers of the products they sell.  That is not the law in Alabama.

or SteamVac®, neither Plaintiff asserts that she received anything other than an authentic PowerSteamer® or an authentic SteamVac®.  Thus, to the extent the trade names created express warranties as to the authenticity of the products, as opposed to their function or capabilities, such warranties were satisfied.

## B. RICO

Plaintiffs allege claims under § 1962(c) for racketeering activity and § 1962(d) for conspiracy to violate the provisions of RICO, both of which they fail to plead sufficiently.  The court addresses the substantive RICO claim under § 1962(c) first, then the § 1962(d) RICO conspiracy claim.

### (i). Section 1962(c)

Pursuant to 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  "A violation of § 1962(c) . . . requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (internal citation omitted); *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006).

(a) <u>A Pattern of Racketeering Activity</u>

"A pattern of racketeering activity, for purposes of the RICO Act, requires at least two acts of racketeering activity. An act of racketeering is commonly referred to as a predicate act . . . [and] is shown when a racketeer commits at least two distinct but related predicate acts." *Mohawk Indus.*, 465 F.3d at 1283 (internal quotation marks and citation omitted). As defined in RICO, "racketeering activity" includes, among others, acts related to mail fraud under § 1341and wire fraud under § 1343. *See* 18 U.S.C. § 1961(1)(B).

Here, Plaintiffs allege the predicate acts of mail and wire fraud. *See* doc. 1 at ¶69 in <u>Green</u>; doc. 1 at ¶69 in <u>Boyd</u>. When a plaintiff alleges that the "racketeering activity"consists of "predicate acts involving fraud, those predicate acts must be pleaded with particularity, in accordance with Fed. R. Civ. P. 9(b)." *See Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1355-56 (11th Cir. 2008); *see also Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283,1291 (11th Cir. 2010) (explaining that because the plaintiffs "alleged pattern of racketeering consist[s] entirely of the predicate acts of mail and wire fraud, their substantive RICO allegations must comply not only with . . . *Twombly* and *Iqbal* but also with Fed. R. Civ. P. 9(b)'s heightened pleading standard"). "[P]ursuant to Rule 9(b), a plaintiff must allege: (1) the precise statements, documents, or

misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the plaintiffs; and (4) what the defendants gained by the alleged fraud." *Am. Dental Ass'n*, 605 F.3d at 1291 (internal quotation marks and citation omitted). Likewise, "[t]he plaintiff must allege facts with respect to each defendant's participation in the fraud." *Id.*

(b) Conduct of an Enterprise

To state a claim under § 1962(c), the plaintiffs must also establish requirements (1) and (2) above, namely, facts supporting the conduct of an enterprise and that enterprise's common goal. *See United States v. Turkette*, 452 U.S. 576, 583 (1981); *Mohawk Indus.*, 465 F.3d at 1283. "The 'enterprise' is not merely the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern." *Turkette*, 452 U.S. at 583. "An enterprise 'includes an individual partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Mohawk Indus.*, 465 F.3d at 1284 (quoting 18 U.S.C. § 1961(4)).

"An association-in-fact enterprise requires the existence of an *entity*, 'an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit.'" *In re Managed Care Litig.*, 298 F. Supp. 2d 1259,

1273 (S.D. Fla. 2003) (emphasis in original) (quoting *Turkette*, 452 U.S. at 583).

Such a requirement ensures that "all RICO enterprises have a structure and some

mechanism for controlling and directing the affairs of the enterprise." *Id.* (internal

quotation marks and citation omitted).  Indeed, a RICO enterprise "requires a

certain amount of organizational structure . . . . [S]imply conspiring to commit

fraud is not enough to trigger the Act if the parties are not organized in a fashion

that would enable them to function as a racketeering organization for other

purposes." *Id.* (internal citation omitted).  And the defendant must participate in

the management or operation of the enterprise.  *Mohawk Indus.*, 465 F.3d at 1283.

However, an informal and loose association will suffice because "the

Eleventh Circuit has not bound itself to strict metaphysical structural

requirements."  *See In re Managed Care*, 298 F. Supp. 2d at 1275.  Likewise, in

this circuit, "there has never been any requirement that the common purpose of the

enterprise be the sole purpose of each and every member of the enterprise."

*Mohawk Indus.*, 465 F.3d at 1285-86.  However, "[s]ince 'diverse parties . . .

customarily act for their own gain or benefit in commercial relationships,' a

complaint founded on commercial relationships between the alleged components

of the enterprise should plead facts 'dispel[ling] the notion that the different

parties entered into [the alleged] agreements . . . for their own gain or benefit.'"  *In*

*re Managed Care*, 298 F. Supp. 2d at 1274 (quoting *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 677 n.4 (7th Cir. 2000)).  "Importantly, the Court held in *Iqbal*, as it had in *Twombly*, that courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than unlawful conduct the plaintiff would ask the court to infer."  *Am. Dental Ass'n*, 605 F.3d at 1290 (internal quotation marks and citation omitted).

(c)  <u>Plaintiffs Fail to State a Claim Under § 1962(c)</u>

Defendants move to dismiss Plaintiffs' 1962(c) claims asserting that Plaintiffs fail to sufficiently plead their respective RICO claims, especially given Rule 9(b)'s heightened standard.  The court agrees.  In short, Plaintiffs present the court with nothing more than the alleged breach of warranty to support their RICO claims.  Taking all of those facts as true, as it must, the court finds Plaintiffs' allegations fail to meet the heightened pleading required for fraud claims and fail to identify a plausible RICO enterprise.  *See, e.g.*, *Kivisto v. Miller, Canfield, Paddock, & Stone, PLC*, No. 10-12654, 2011 WL 207898, at *4 (11th Cir. Jan. 25, 2011) (affirming dismissal of the plaintiff's RICO claim for failure to plausibly allege sufficient facts of mail fraud or of an agreement to engage in an enterprise or conspiracy).

As to the racketeering activity, Plaintiffs allege predicate acts consisting of

mail and wire fraud, presumably arising from the advertisement of the TTI and
Bissell products.  However, the conclusory nature of Plaintiffs' RICO claims and,
more specifically, the lack of detail Plaintiffs provide when describing the alleged
mail and wire fraud falls short of the pleading standards mandated by Rule 9 and
the Supreme Court's instructions in *Iqbal* and *Twombly*.   At best, Plaintiffs assert
that the alleged mail and wire fraud consists of any mailing or internet
advertisements by Wal-Mart that included the TTI and Bissell products in
question.  The fraud consists of the sale of products under the trademarked names
SteamVac® and PowerSteamer® that do not, in fact, produce steam.  Importantly,
Plaintiffs do not allege any specifics as to the mail or wire fraud, and, likewise,
neglect to specify whether either named Plaintiff received the mail or internet
advertisements.[9]   Indeed, Plaintiffs would have the court simply assume that
Defendants advertise through the mail and on the internet and, as a result, the
court should presume Defendants intended to engage in mail and wire fraud
because their respective products are deceptively named.  Without additional facts
or specificity, such an assertion falls short of the heightened standard required for

---

[9] The court notes that Plaintiffs' complaints both specify that they purchased the products
at physical Wal-Mart locations in Alabama – thus the court can at least determine Plaintiffs did
not purchase the items through the mail or internet.  *See* doc. 1 at ¶14 in <u>Boyd</u>; doc. 1 at ¶14 in
<u>Green</u>.

mail and wire fraud under Eleventh Circuit precedent.  *See Am. Dental Ass'n*, 605
F.3d at 1291.  *Iqbal*, *Twombly*, and Rule 9 require more to push Plaintiffs' claims
from theoretically possible to actually plausible, especially where, as here,
Plaintiffs' allegations describe commercially reasonable and commonplace
conduct.[10]

Turning to the conduct of the enterprise, Plaintiffs  fail to allege specific
facts regarding the conduct of Defendants or any facts supporting the ongoing
operation of the alleged enterprise.  Typically, "enterprise in subsection (c) [of §
1962] connotes generally the vehicle through which the unlawful pattern of
racketeering activity is committed . . . ."  *Nat'l Org. for Women, Inc. v. Scheidler*,
510 U.S. 249, 259 (1994).  Plaintiffs make no attempt to identify any vehicle for
illegal activity nor assert any plausible interaction between TTI and Wal-Mart or
Bissell and Wal-Mart that suggests the necessary hierarchical decision-making or
a continuing unit in a RICO enterprise.

Where, as here, Plaintiffs rely upon a common commercial relationship as
the basis to allege a RICO enterprise, they should allege facts dispelling the notion

---

[10]Plaintiffs also lump together allegations with respect to all of Defendants.  But "'in a
case involving multiple defendants . . . the complaint should inform each defendant of the nature
of his alleged participation in the fraud.'"  *Ambrosia Coal & Const. Co. v. Pages Morales*, 482
F.3d 1309,1317 (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381
(11th Cir. 1997)).

that the parties engaged in independent behavior for their own respective

economic gain.  *See In re Managed Care*, 298 F. Supp. 2d at 1274; *see also Am.*

*Dental Ass'n*, 605 F.3d at 1283 (allowing inference of lawful conduct from facts

that indicate such an obvious alternate explanation to a plaintiff's claim).  Indeed,

courts have concluded that the mere fact that a retailer sells a good or advertises a

manufacturer's product does not create a RICO enterprise between the

manufacturer and the retailer.  *See, e.g.*, *Stachon*, 229 F.3d at 677 (affirming

district court and echoing that court's refusal to find a RICO enterprise where

manufacturers and wholesalers acted pursuant to their normal commercial

relationships); *El-Issa v. Compaq Computer Corp.*, No. 97C5859, 1997 WL

790730, at *3-5 (N.D. Ill. Dec. 19, 1997) (granting the motion to dismiss where

the complaint alleged nothing more than "an ordinary manufacturer-retailer

relationship" in which "the allegedly fraudulent acts of the defendant [were]

entirely incidental" because the plaintiffs failed to allege "anything more than a

typical business relationship"); *Arthur v. Guerdon Indus., Inc.*, 827 F. Supp. 273,

279-80 (D. Del. 1993) (granting summary judgment and denying the existence of a

RICO enterprise where "the plaintiffs have merely shown a distribution network

where manufacturers provided a product to retailers who then distributed the

product to the public"); *see also In re Mastercard Int'l Inc., Internal Gambling*

*Litigation*, 132 F. Supp. 2d 468, 487 (E.D. La. 2001) ("Aside from the fact that the

defendants' conducted a normal business relationship, there has been no factually

supported allegation regarding any type of hierarchy beyond the fundamental

business relationship."); *800537 Ontario Inc. v. Auto Enter., Inc.*, 113 F. Supp. 2d

1116, 1123 (E.D. Mich. 2000) (granting the motion to dismiss where the plaintiffs'

allegations "evidence nothing more than the fact that [the defendants] ha[d] a

business relationship" and the "mere fact that [the defendants] engaged in a

business relationship is insufficient to establish that Defendants functioned as a

continuous unit for RICO purposes") (citation and internal quotation marks

omitted); *Jubelirer v. MasterCard Int'l, Inc.*, 68 F. Supp. 2d 1049, 1053 (W.D.

Wis. 1999) (granting motion to dismiss because "[a]n enterprise must be more

than a routine contractual combination for the provision of financial services" and

accepting the plaintiff's allegations as sufficient would make almost all creditors

and merchants subject to RICO liability).

By comparison, the court notes RICO pleadings that the Eleventh Circuit

found satisfactory.  *See Mohawk Indus.*, 465 F.3d at 1283-87.[11]  In *Mohawk*

*Industries*, which reversed the district court's 12(b)(6) dismissal, the Eleventh

---

[11] The court also notes that the Eleventh Circuit decided *Mohawk* prior to the Supreme Court's decision in *Iqbal* and, therefore, applied a somewhat more permissive pleading standard than this court is obligated to apply here.

Circuit analyzed at length how the plaintiffs alleged the defendant's participation in the operation or management of the enterprise functioned and the role the defendant had in facilitating the employment of illegal workers. *See id.* at 1284 (quoting the facts alleged in plaintiffs' complaint). The court was able to glean from the pleadings how the enterprise conducted the illegal activities as well as how the various entities interacted to form a continuing unit and a RICO enterprise. *See id.*

Here, the court is hard pressed to analyze Plaintiffs' RICO claims because Plaintiffs do little more than recite hornbook law. Plaintiffs' RICO claims fail to present the court with any idea how the RICO enterprise operates or even the basis Plaintiffs have to believe it exists – save for the fact that Plaintiffs purchased vacuums from Wal-Mart. Admittedly, the hurdle to survive a motion to dismiss is not a high one. *See Twombly*, 550 U.S. at 556 (cautioning that the plausibility standard does not require heightened fact pleading and is not a "probability requirement"). However, unfortunately for Plaintiffs, they failed to meet that relatively low hurdle. To accept such broad-sweeping RICO liability without further specificity would require retailers, like Wal-Mart, to police their stores and verify each and every advertising claim or warranty issued by a manufacturer, lest they subject themselves to the stigma of RICO claims. While the common

purpose of making money is a sufficient goal to satisfy RICO's requirements, *see United States v. Church*, 955 F.2d 688, 698 (11th Cir. 1992), the court reiterates that Plaintiffs allegations are particularly lacking when that common purpose is the very basis for Defendants' commercial, and entirely ordinary, relationships. *See Am. Dental Ass'n*, 605 F.3d at 1290 (noting a court's ability to infer from the factual allegations obvious alternative explanations to the unlawful conduct plaintiffs allege).

**(b) Section 1962(d)**

Section 1962(d) states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."[12]  "A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing the defendant[s] agreed to the overall objective of the conspiracy; or (2) by showing that the defendant[s] agreed to commit two predicate acts."  *Am. Dental Ass'n*, 605 F.3d at 1293 (internal citation omitted).  "A plaintiff need not

---

[12] Unlike its sister circuits, the Eleventh Circuit has not held that a substantive RICO violation is required to find RICO conspiracy.  *See Am. Dental Ass'n*, 605 F.3d at 1296 n.6. However, the Eleventh Circuit has held that where, as here, the plaintiffs' RICO conspiracy claim "adds nothing" to substantive RICO violation – as opposed to additional and separate allegations from those in the substantive RICO count – then dismissal of the conspiracy claim is appropriate because the alleged conduct does not constitute a RICO violation.  *See id.* (citing *Jackson v. Bellsouth Telecomm.*, 372 F.3d 1250, 1269 (11th Cir. 2004)).  Thus, alternatively, Plaintiffs' RICO conspiracy claim fails because of the failure to plead an underlying RICO violation and the absence of any additional allegations in the RICO conspiracy claim.

offer direct evidence of a RICO agreement: the existence of conspiracy may be inferred from the conduct of the participants." *Id.* Nonetheless, "'when allegations of parallel conduct are set out . . . they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'" *Id.* at 1294 (quoting *Twombly*, 550 U.S. at 557).

Plaintiffs fail to allege any agreement between Wal-Mart and TTI or Bissell. Plaintiffs offer only conclusory statements instead and urge the court to conclude from their assumptions that the parties must have agreed to advertise the allegedly fraudulent products. "Here, the allegations in Plaintiffs' complaint[s] do not support an inference of an agreement to the overall objective of the conspiracy or an agreement to commit two predicate acts." *Id.* at 1293. Simply put, Plaintiffs' complaints fail to allege anything more than the fact that Wal-Mart sold Bissell and TTI products, including the Power Steamer® and SteamVac®. Plaintiffs conclude from those sales, and the presumed retailer-manufacturer contract between Wal-Mart and each of the manufacturers with whom it does business, that the Defendants must have agreed to carry out a scheme to advertise fraudulent products. The court is "not required to admit as true this unwarranted deduction of fact." *Id.* at 1294 (citing *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1268

(11th Cir. 2009)); *Iqbal*, 129 S. Ct. at 1950 (noting a court's duty when considering a motion to dismiss to take a plaintiff's factual allegations as true, but rejecting the need to accept legal conclusion couched as factual allegations). Here, the complaint fails to plausibly suggest that "Defendants have acted in any way inconsistent with the independent pursuit of their own economic self-interest. Accordingly, Defendants' parallel conduct [i.e. the advertising and sale of PowerSteamers® and SteamVacs®] is equally indicative of rational independent action as it is concerted, illegitimate conduct and thus stays in neutral territory." *Am. Dental Ass'n*, 605 F.3d at 1295 (citation omitted).  Instead, as the Eleventh Circuit concluded in *American Dental Ass'n*, conclusory statements combined with broad allegations of parallel conduct that is otherwise commercially rationale do not suggest a meeting of the minds and will not support a RICO conspiracy claim.  *See id.* at 1294 (rejecting the plaintiffs' "conclusory statements" as merely formulaic recitation where the plaintiffs merely allege that the actions were not taken in isolation and that the defendants agreed to commit the acts of fraud without providing any specifics that would make such a claim plausible).

### (c) Option to Re-File with RICO Case Statement

"When a statute is broadly worded in order to prevent loopholes from being drilled in it by ingenious lawyers, there is a danger of its being applied to

situations absurdly remote from the concerns of the statute's framers." *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226 (7th Cir. 1997) (rejecting the application of RICO to "a free-standing corporation such as Chrysler merely because Chrysler does business through agents, as virtually every manufacturer does").  Here, Plaintiffs ask this court to subject every manufacturer-retailer relationship to the prospect of treble damages and RICO prosecution.[13]  In effect, Plaintiffs embrace RICO as a remedy in the event a manufacturer breaches a warranty and a retailer continues to sell that manufacturer's product.  Such a result is untenable.

Although Plaintiffs have not moved to amend their respective complaints, the court dismisses the RICO claims without prejudice, to allow Plaintiffs to refile and replead such claims in sufficient detail.  In the event Plaintiffs choose to do so, Plaintiffs should also include a RICO case statement.

## V.  CONCLUSION

For the reasons stated more fully above, the court **GRANTS** Defendants' respective motion to dismiss.

---

[13]The court also notes that Plaintiffs allege breach of express warranty, yet couple that action with a fraud claim.  Doc. 1 in <u>Boyd</u>; doc. 1 in <u>Green</u>.  In effect, Plaintiffs are saying that the breach of express warranty amounts to fraud, but plead it as a contract claim.  Although Plaintiffs are free to plead their complaint however they please, courts look unfavorably upon breach of contract claims masquerading as RICO claims.  *See, e.g.*, *Harrell v. Primedia, Inc.*, No. 02CV2893(JSM), 2003 WL 218 04840, at *1 (S.D.NY. Aug. 6, 2003) (rebuking the plaintiffs' attempt to take a "straightforward breach of contract case . . . [and] turn it into a RICO claim, with callous disregard" to the effects of a RICO claim on a defendant's reputation).

**DONE** this the 29th day of July, 2011.

_____

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE